IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DANIEL R. COUSINS, | : |
| Plaintiff, | : |
| v. | : Civ. No. 16-302-LPS |
| REBECCA DUTTON-MCCORMICK, et al., | : |
| Defendants. | : |

Daniel R. Cousins, James T. Vaughn Correctional Center, Smyrna, Delaware, Pro Se Plaintiff.

Allison Jean McCowan, Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendants.

**MEMORANDUM OPINION**

March 1, 2021
Wilmington, Delaware

**STARK, U.S. District Judge:**

## I. INTRODUCTION

Plaintiff Daniel R. Cousins ("Plaintiff"), an inmate at the James T. Vaughn Correctional Center ("JTVCC") in Smyrna, Delaware, filed this action pursuant to 42 U.S.C. § 1983 alleging constitutional violations. (D.I. 3) Plaintiff appears *pro se* and has been granted leave to proceed *in forma pauperis*. (D.I. 5) Before the Court is Defendants' motion for summary judgment and Plaintiff's opposition. (D.I. 77)

## II. BACKGROUND AND FACTS PRESENTED BY THE PARTIES[1]

In March 2000, Plaintiff was indicted on two counts of rape in the first degree, one count of rape in the fourth degree, and one count of unlawful sexual contact in the second degree. *See Cousins v. State*, 2004 WL 1097700, 850 A.2d 302 (Del. 2004) (table). The victim was a five-year old child. *Id.* Following a jury trial, Plaintiff was found guilty as charged and sentenced in November 2000 to a total of sixty-seven years at Level V, suspended after serving thirty years, for one year at Level IV home confinement, followed by probation. *Id.*

Plaintiff is housed at JTVCC. On June 17, 2014, Plaintiff wrote to Mike Little ("Little"), former director of JTVCC legal services, regarding denial of law library access. (D.I. 82 at 22) Plaintiff stated that he believed his access to the law library was curtailed based upon his sex offender status. (*Id.* at 22) Plaintiff stated that while at his law library appointment during the week of June 16, 2014, he had addressed the law library access issue with Defendant Rebecca Dutton-McCormick ("McCormick") who, at the time, was employed as a paralegal at JTVCC and whose duties included supervising inmate paralegals and scheduling inmate legal appointments. (D.I. 79 at 5) Plaintiff stated that McCormick told him it was her "right" to choose who gets what

---

[1] The facts are construed in favor of Plaintiff, the non-moving party.

1

appointment and when. (D.I. 82 at 22) Plaintiff complained that he was only allotted one law library appointment during the week of June 1, 2014, when he had specifically requested two visits. (*Id.*) Little responded that the law library request form is "a request" and not a guarantee that an inmate will receive appointments requested. (*Id.* at 24) Little stated that McCormick considered all requests submitted by the required deadline and provided a weekly schedule. (*Id.*) He advised Plaintiff that McCormick did not identify inmates based upon the crimes they committed when scheduling law library appointments. (*Id.*) Plaintiff's response to Little, dated June 19, 2014, did not refer to McCormick. (*Id.* at 25)

On June 25, 2014, Plaintiff reported to the JTVCC main law library for a scheduled law library appointment and signed a request to use one of the library's typewriters. (D.I. 79 at 6) Plaintiff sat at a table within McCormick's immediate view and began typing. (*Id.*) According to McCormick, "as with all other law library resources and materials, the typewriter was to be used solely for legal purposes such as typing court documents, motions, pleadings, and legal correspondence and not for personal, non-legal matters of any nature." (*Id.*) At some point during the appointment, an inmate paralegal told McCormick that Plaintiff was using the law library appointment and typewriter for nonlegal purposes. (*Id.*) The inmate paralegal told McCormick that Plaintiff was typing a sex novel that he had handwritten. (*Id.*) McCormick went to the table where Plaintiff was seated and saw that Plaintiff was, as had been reported to her, typing a sex novel; Plaintiff was not typing any legal documents or materials related to pending legal matters. (*Id.* at 6-7)

McCormick left the law library and contacted Defendant Correctional Officer Enoch Totimeh ("Totimeh") who, at the time, was assigned to supervise and maintain security and discipline as the officer in charge for the building where the main JTVCC law library is located. (*Id.* at 11-12) McCormick told Totimeh of Plaintiff's improper use of his law library appointment and

2

library resources and asked Totimeh to shakedown (*i.e.,* search) Plaintiff, the materials in Plaintiff's possession, and the materials Plaintiff was typing. (*Id.* at 7)

Totimeh went to the law library and saw that Plaintiff was typing materials that Totimeh identified and characterized as "sexually inclined" material. (*Id.* at 12) Totimeh confiscated the non-legal materials. (*Id.*) According to Totimeh and McCormick, at that point Plaintiff became disorderly and threatening. (*Id.* at 7, 12-13) Totimeh gave Plaintiff a direct order to leave the law library and at the same time advised Plaintiff that his actions constituted an improper use of the law library and its resources. (*Id.* at 13) He informed Plaintiff that the law library was not for use by Plaintiff or any other inmate for typing non-legal materials such as "alleged novels" including, but not limited to, sex-related ones. (*Id.*) Plaintiff shouted that he could type anything he wanted and that Totimeh could not take the material. (D.I. 33-3 at 1) Plaintiff finally complied with the order and was placed in an empty classroom. (D.I. 79 at 13)

McCormick states that the materials were confiscated because they were considered contraband under inmate housing rules and departmental and institutional policy/procedure and were also evidence of the impermissible use of law library appointments and resources. (*Id.* at 8) Totimeh and Burman state that institutional policies in effect on June 25, 2014 did not permit inmates to possess contraband and were promulgated in order to promote safety, security, order, and discipline within the facility for the benefit of everyone, including staff and inmates.[2] (D.I. 79 at 15, 95) They further state that materials such as sexually explicit and/or graphically violent material were not permitted to be sent into the facility or retained or personally produced within the facility and were not to be circulated amongst other inmates. (*Id.*)

---

[2] According to JTVCC paralegals Brian Engrem and Tim Martin, Plaintiff's materials were impermissible under then existing policy and inmate housing rules. (D.I. 79 at 103-11)

3

DOC Policy Number 4.5, Policy for Incoming Publications, in effect at the time, permitted an inmate to subscribe to or receive publications unless the publication[3] was detrimental to the security, discipline, or good order of the institution or might facilitate criminal activity.[4] (D.I. 79 at 113) Policy No. 4.5 specifically provides for the rejection of "sexually explicit material, which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity." (*Id.* at 114)[5]

Defendant Lieutenant Barry Burman ("Burman") was contacted about the incident and reported to the law library. (*Id.* at 92) Burman spoke to McCormick and Totimeh and directed Totimeh to draft a disciplinary report and an accompanying Form 537 inventory sheet reflecting the confiscated materials.[6] (*Id.* at 13, 93) The inventory form describes the confiscated property as one manilla envelope with sexual material and two folders with sexual material. (D.I. 82 at 41)

---

[3] A publication is described as "a book, booklet, pamphlet, or ***similar document***, or a single issue of a magazine, periodical, newsletter newspaper, ***plus such other materials*** . . . such as advertising brochures, flyers, and catalogs." (D.I. 79 at 113) (emphasis added)

[4] In *Boyer v. Taylor*, 2013 WL 1332443 at *12 (D. Del. Mar. 30, 2013), a prison official stated that: (1) Policy 4.5 is patterned after the Federal Bureau of Prisons' policy on incoming publications; (2) its purpose is to balance the promotion of education and literacy with the institution's responsibility to provide a safe and secure facility; (3) the ban on sexually explicit material is necessary for the safety and security of JTVCC; (4) inmates often trade, barter, and sell sexually explicit material to other inmates, and this conduct presents a security risk; (5) it is believed that sexually explicit depictions are contrary to the rehabilitation of sex offenders and rapists and may contribute to other unacceptable and dangerous behaviors amongst the inmate population as a whole.

[5] The Court takes judicial notice that Inmate Housing Rules and Reference Guide, effective February 23, 2014, provides that "reading materials will not . . . contain sexually explicit material." *See* JTVCC Inmate Housing Rules and Reference Guide at https://www.law.umich.edu/special/policyclearinghouse/Documents/DE%20-%20JTVCC%20Inmate%20Housing%20Rules%20and%20Reference%20Guide.pdf at IV.D.5.a) (last visited January 25, 2020).

[6] Inmate Housing Rules in effect at the time provided confiscated items will be held as evidence pending disciplinary and/or criminal proceedings and, if the inmate is found guilty, the items will be disposed of. *See* Inmate Housing Rules and Reference Guide at IV.C.7.a), b).

According to Burman, the confiscated materials were forwarded to the shift commander's office to be placed and secured in the evidence room pending a subsequent disciplinary hearing in accordance with department and institutional policy and practice. (*Id.* at 93) Plaintiff was taken to a different area pending possible disciplinary action. (*Id.* at 7) Burman reviewed and approved Totimeh's drafts and Plaintiff was served copies of the disciplinary report. (D.I. 33-3 at 1; D.I. 79 at 93) Plaintiff was charged with disorderly or threatening behavior, abuse of privileges, failing to obey an order, lying, and possession of non-dangerous contraband, and the report described Plaintiff's conduct as "typing a sex novel on the typewriter located in the law library which is not permitted" and "typing materials that appear to be sexually inclined." (D.I. 33-3 at 1)

The next day, Lieutenant Welcome ("Welcome") conducted Plaintiff's disciplinary hearing. (*Id.* at 19-23) Welcome found Plaintiff guilty of abuse of privileges, failing to obey an order, and possession of non-dangerous contraband, and not guilty of disorderly or threatening behavior and lying. (*Id.*) Plaintiff was sanctioned to loss of all privileges for five days (*Id.*) He did not appeal. (*Id.*)

After the disciplinary hearing, Burman was informed by the shift commander that Plaintiff had been transferred to a higher security housing area. (*Id.* at 94) The shift commander on duty, Marcello T. Rispoli states that Burman had no authority to order or implement Plaintiff's transfer to higher security housing unit. (*Id.* at 99-100) Burman states that he was made aware of the transfer after the fact. (*Id.* at 94) Burman states that any order that required Plaintiff's move to pre-hearing detention or higher security is solely within the purview and authority of the shift commander. (*Id.* at 94-95)

Plaintiff submitted two grievances as a result of the June 25, 2014 incident, seeking the return of the property confiscated from him. (*Id.* at 24-36) Both grievances were returned as

5

unprocessed, noting that disciplinary action appeals should be sent to the hearing officer and that confiscated contraband is not returned to inmates, like Plaintiff, who are found guilty of the possession of non-dangerous contraband. (*Id.* at 24-25, 74)

On June 26, 2014, Plaintiff wrote to Little and former JTVCC Warden Pierce regarding the June 24, 2014 incident. (D.I. 82 at 42, 43) In his letters, Plaintiff referenced that Little had secured Plaintiff's fictional novels in his office for safekeeping. (*Id.*) Plaintiff stated that he intended to file a lawsuit, asserted that Totimeh and McCormick had taken vindictive actions against Plaintiff, and that McCormick had cursed at Plaintiff a number of times after he informed her, in the presence of Burman, that he would be naming her as a defendant in a lawsuit. (*Id.*) The letters state that the June 24, 2014 incident was a result of Plaintiff's prior challenge after McCormick gave away law library appointments. (*Id.*) McCormick states that she has no recollection of any conversations with Plaintiff prior to the June 25, 2014 incident, including any conversations concerning a complaint with the scheduling or planning of inmate appointments for the law library. (D.I. 79 at 6)

Plaintiff describes his manuscript as an "action/adventure/erotic novel" that contains graphic violence and graphic sexual scenarios. (*Id.* at 54, 55) Excerpts of the manuscript were filed under seal and were reviewed by the Court. (D.I. 80-1 at 17-23) Plaintiff testified that he had other inmates – described as "focus groups" – review portions of his novels and give Plaintiff their opinions, but he did not circulate or "publish" his novels. (*Id.* at 58, 61, 65) Plaintiff acknowledged that JTVCC can preclude sexually explicit published material from entering the institution. (*Id.* at 58) Plaintiff testified that his material is permitted and can be circulated because it is not a published work, was not brought into JTVCC but came from his "own head," and is not an edited and structured work that becomes printed. (*Id.* at 61-63)

Plaintiff commenced this action on April 25, 2016. (D.I. 3) Following screening, Plaintiff was allowed to proceed with First Amendment claims against McCormick, Totimeh, and Burman, and retaliation claims against McCormick and Burman. (*See* D.I. 7 at 11-12)

### III.  LEGAL STANDARDS

Under Federal Rules of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). If the moving party has carried its burden, the nonmovant must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)).

In reviewing a motion for summary judgment, the Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). If the Court can determine that "there is no genuine issue as to any material fact" and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Defendants move for summary judgment on the grounds that: (1) Plaintiff failed to fully exhaust his available administrative remedies pursuant to the Prisoner Litigation Reform Act; (2) summary judgment should be granted on Plaintiff's claim that the confiscation of his manuscript violated his right to free speech under the First Amendment; (3) the retaliation claim fails as a matter of law; (4) the claims are barred by the Eleventh Amendment; (5) and the claims are barred by the doctrine of qualified immunity. (D.I. 78 at 2)

## IV. DISCUSSION

### A. First Amendment

Defendants argue that summary judgment is appropriate because Plaintiff failed to establish a viable First Amendment claim and cannot show that the confiscation of the manuscript was not reasonably related to any legitimate penological interest. Defendants argue that JTVCC and/or Delaware Department of Correction ("DOC") regulations that restrict the receipt or possession of pornographic or sexually explicit, graphic, or violent material are tied to, and further, several reasonable legitimate penological goals of the facility. Plaintiff agrees that the DOC is "absolutely allowed to police what enters its institutions," but argues that the materials confiscated from him do not fall under the purview of the DOC policy at issue because its deals only with "incoming publications." (D.I. 82 at 7) Plaintiff argues that his manuscript is not an incoming publication that entered JTVCC and that, as a writer, he is allowed to possess the confiscated documents under the First Amendment. (D.I. 82 at 7)

8

The record reflects that Plaintiff's writings were confiscated for two reasons: (1) the sexually explicit materials are considered contraband under inmate housing rules and departmental and institutional policy/procedure; and (2) the materials were evidence of impermissible use of law library appointments and resources. Plaintiff does not allege his constitutional rights were violated when the materials were confiscated as evidence of impermissible use of the law library. His claim rests upon the theory that as writer he has the right under the First Amendment to possess sexually explicit material because the manuscript did not enter JTVCC in violation of Policy No. 4.5.[7]

The bases for disciplining Plaintiff were two-fold: he was in possession of sexually explicit material, which is considered contraband, and he did not use his law library appointment for legal purposes. The record evidence indicates that materials such as sexually explicit and/or graphically violent material are not permitted to be enter JTVCC or be retained or personally-produced within the facility and may not be circulated among inmates. Plaintiff's First Amendment claim rests upon the unconstitutionality of the rules and regulations that prohibit possession or control of sexually explicit contraband found within JTVCC.

To determine whether the prison rules/regulations at issue pass constitutional muster, the Court applies a reasonableness standard. *See Turner v. Safley*, 482 U.S. 78 (1987) (reasonableness standard applied to prison regulation regarding incoming mail); *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989) (reasonableness standard applied to BOP regulation regarding incoming publications and warden's rejection of certain publication containing sexual content). A reasonableness standard asks whether a prison regulation that impinges on inmates' constitutional rights is "reasonably related" to legitimate penological interests. *Turner*, 482 U.S. at 78. The reasonableness standard considers the

---

[7] The Court has previously determined that Policy 4.5 meets the *Turner* test and does not – in rejecting sexually explicit and/or obscene material – violate an inmate's First Amendment rights. *See Boyer*, 2013 WL 1332443, at *12.

9

following four factors: (1) whether there is a "valid, rational connection" between the regulation and a legitimate and neutral governmental interest; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, on inmates' liberty, and on the allocation of limited prison resources; and (4) whether the regulation represents an "exaggerated response" to prison concerns. *See Turner*, 482 U.S. at 78-79.

The United States Court of Appeals for the Third Circuit has developed a two-step analysis regarding the *Turner* factors. *See Sharp v. Johnson*, 669 F.3d 144, 156 (3d Cir. 2012). "First, the prison has the burden of demonstrating the first *Turner* factor. This burden is slight, and in certain instances, the connection may be a matter of common sense." *Id.* (citing *Wolf v. Ashcroft*, 297 F.3d 305, 308 (3d Cir. 2002)). Second, if the prison meets its burden under the first *Turner* factor, then the Court considers the other *Turner* factors. *See id.* The inmate has the burden of production regarding the other *Turner* factors, and the inmate retains the overall burden of persuasion pertaining to whether the DOC's policy is unconstitutional. *Id.* at 156-58.

The record evidence is that JTVCC rules and policies prohibiting sexually explicit material are necessary to promote safety, security, order, and discipline within the JTVCC for the benefit of staff and inmates. The Court finds this explanation satisfies the slight burden required by the first *Turner* factor. *See e.g., Ramirez v. Pugh*, 486 F.Supp.2d 421, 42834 (M.D. Pa. 2007) (finding that regulations prohibiting inmates from possessing Playboy and Penthouse reasonably serve legitimate penological interests concerning rehabilitation and institutional security). Notably, Plaintiff freely admits that he disseminated his sexually explicit novel to other inmates for their review of the material. Having reviewed excepts, there is no doubt about its specific sexually explicit content.

Accordingly, the burden of production shifts to Plaintiff to establish the remaining *Turner* factors. Plaintiff has failed to meet his burden.

As to the second factor, Plaintiff may exercise his First Amendment rights in other ways, although not with respect to sexually explicit material. With regard to the third factor, prohibited materials are limited to sexually explicit material, which by its nature or content poses a threat to the security, good order, or discipline of the institution or facilitates criminal activity. *See e.g., Thornbaugh*, 490 U.S. at 418 ("Here, the class of publications to be excluded is limited to those found potentially detrimental to order and security . . . . [Thus,] [w]here, as here, the right in question 'can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike,' [the courts should defer to the] informed discretion of corrections officials.") (quoting *Turner*, 482 U.S. at 90). As to the fourth factor, the removal of the manuscript from Plaintiff is not an "exaggerated response." *Thornbaugh*, 490 U.S. at 418 ("We agree with the District Court that these regulations, on their face, are not an 'exaggerated response' to the problem at hand: no obvious, easy alternative has been established."). Notably, Plaintiff has failed to suggest any reasonable alternative "that fully accommodates the prisoner's rights at de minimis cost to valid penological interests." *See id.*

The Court takes judicial notice that Plaintiff is a convicted sex offender. It is evident from Plaintiff's testimony that he does not believe his sexually explicit writings and the dissemination of his manuscript to fellow inmates warranted its confiscation. His actions, however, are in direct contravention of the DOC's position that sexually explicit material by its very nature or content poses a threat to the security, good order, or discipline of the institution. Plaintiff's contention that he may possess sexually explicit material of his own creation does not square with the rationale behind the prohibition against possessing sexually explicit material. Policy Number 4.5

11

contemplates incoming publications and it describes a publication as book, booklet, pamphlet, or similar documents, such as the manuscript at issue, and explains why sexually explicit material may not be brought into JTVCC.

While Plaintiff's manuscript may not have been brought into JTVCC in the traditional manner, Plaintiff nonetheless introduced the sexually explicit content into JTVCC. Certainly JTVCC has a valid interest in regulating a prisoner's writings that are sexually explicit. *See e.g., Goldsmith v. Sharrett*, 614 F. App'x 824, 829 (6th Cir. 2015) (state prison had valid interest, for purposes of determining whether state prisoner's speech was protected by First Amendment, in regulating prisoner's fictional writings that included sexually explicit content involving prison staff and the like); *Smith v. Blackman*, 2019 WL 3047081 (N.D. Fl. May 21, 2019) (no First Amendment violation following inmate being sanctioned because he was in possession of risk-relevant materials, including a sexually explicit and violent manuscript inmate authored). Plaintiff is not banned from writing. He is not, however, free to write whatever he chooses – particularly when his writings implicate the internal order and discipline and institutional security of JTVCC – and then circulate those materials around the facility. An inmate's speech is not protected by the First Amendment if it is "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974).

For the above reasons, the Court will grant Defendant's motion for summary judgment on the First Amendment free speech issue.

**B. Retaliation**

Defendants argue that Plaintiff's retaliation claims lack merit and fail as a matter of law. Plaintiff alleges the evidence of record supports his claims.

12

Plaintiff raises retaliation claims against McCormick and Burman. With regard to McCormick, Plaintiff alleges that she asked Totimeh to go to the law library and confiscate the typed and handwritten pages of Plaintiff's novel in retaliation for Plaintiff's challenge of her authority to her superiors when Plaintiff complained that McCormick denied persons their law library privileges. (*Id.* at 6) As to retaliation by Burman, Plaintiff alleges that after he told Burman, Totimeh, and McCormick that he intended to file a lawsuit naming them as defendants, Burman ordered the correctional officers to search Plaintiff's cell, confiscate all his research materials and writings, and take all of Plaintiff's property to the education building, where Burman separated all of Plaintiff's papers. The Complaint also alleges that, upon Burman's direction, Plaintiff was immediately transferred from his minimum housing assignment to a maximum security housing assignment.

In order to establish a retaliation claim, Plaintiff must show that: (1) his conduct was constitutionally protected; (2) he suffered an adverse action at the hands of prison officials; and (3) his constitutionally protected activity was a substantial or motivating factor in the decision to discipline him. *See Watson v. Rozum*, 834 F.3d 417, 420 (3d Cir. 2016); *see also Mt. Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The causation element requires a plaintiff to prove either: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997).

"[O]nce a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001). When

13

analyzing a retaliation claim, courts consider that the task of prison administrators and staff is difficult, and that the decisions of prison officials require deference, particularly where prison security is concerned. *See Rauser*, 241 F.3d at 334.

As to McCormick, the record contains evidence that Plaintiff wrote to the director of JTVCC legal services on June 17, 2014, and complained that he believed his law library access was curtailed based upon his "sex offender" status; and that he had addressed the law library access issue with McCormick during his law library appointment during the week of June 16, 2014, and she told him it was her "right" to choose who gets what appointment and when. The director of legal services responded to Plaintiff and told him that McCormick considered all requests submitted by the required deadline and provided a weekly schedule, and she did not identify inmates based upon the crimes they committed when scheduling law library appointments. Plaintiff's response, dated June 19, 2014, made no mention of McCormick. McCormick does not recall Plaintiff complaining to her about the scheduling or planning of inmate appointments at the JTVCC law library prior to the June 25, 2014 incident.

Plaintiff's claim against McCormick fails for several reasons. Plaintiff's verbal complaints to McCormick[8] and written complaints to Little constitute protected activity, *see Sears v. Mooney*, 2019 WL 6726839, at *8 (M.D. Pa. Dec. 11, 2019), and the temporal proximity of his complaints and the alleged retaliatory conduct suggests a causal link, allowing a reasonable factfinder to find the first and third prongs of a retaliation claim to be satisfied. Plaintiff has not, however, satisfied the second prong. To do so, Plaintiff's evidence regarding McCormick must rise to the level supporting a finding of adverse action; in other words, Plaintiff's evidence must be sufficient to support a finding

---

[8] It is far from clear that Plaintiff's threats of filing a lawsuit made during the June 25, 2014 incident are considered protected speech. *See e.g., Clay v. Overmyer*, 2015 WL 630379, at *3 (W.D. Pa. Feb. 13, 2015) (threat of filing lawsuit has not been held to be constitutionally protected conduct).

14

that the alleged actions would deter a person of ordinary firmness from engaging in the protected activity of filing a grievance. The record evidence indicates that following the June 25, 2014 occurrence, Plaintiff submitted not one, but two grievances, and later he filed this lawsuit. In light of Plaintiff's own actions, no reasonable jury could find that the alleged retaliatory conduct deterred Plaintiff (or would deter someone in Plaintiff's position) from engaging in constitutional protected activity.

Assuming arguendo, that Plaintiff met his burden to demonstrate a *prima facie* case of retaliation, McCormick has demonstrated by a preponderance of the evidence that she would have taken the same adverse action (*i.e.*, asking Totimeh to perform a shakedown of Plaintiff and the materials in his possession and to confiscate Plaintiff's materials after it was discovered he was using the law library for non-legal purposes and was typing sexually explicit material considered contraband under prison rules and regulations) regardless of Plaintiff's exercise of his constitutionally protected rights.

Plaintiff's retaliation claim against Burman fares no better. The evidence of record does not support a finding of retaliatory conduct by Burman. Despite his argument, Plaintiff produced no evidence that Burman ordered a search of Plaintiff's cell, no evidence that Burman ordered Plaintiff's placement to pre-trial detention or a higher security level, and no evidence that Burman was involved in the punishment imposed on Plaintiff upon the finding of guilt. Even if Plaintiff met his burden to prove a prima facie case of retaliation (which fails for the same reasons the retaliation claim against McCormick fails), Burman has demonstrated by a preponderance of the evidence that he would have taken the same adverse action (*i.e.*, performing his supervisory duties and ordering Totimeh to draft an incident report and disciplinary report, securing the confiscated materials in the

15

shift commander's officer, and serving the disciplinary report upon Plaintiff) regardless of Plaintiff's exercise of his constitutionally protected rights.

No reasonable jury could find that McCormick and/or Burman retaliated against Plaintiff. Accordingly, the Court will grant Defendants' motion for summary judgment on this issue.

## V. CONCLUSION

For the above reasons, the Court will grant Defendants' motion for summary judgment.[9] (D.I. 77)

An appropriate Order will be entered.

---

[9] Having address the merits of Plaintiff's claims, the Court will not address the other grounds raised by Defendants in support of their motion for summary judgment, other than to note that the claims raised against Defendants in their official capacities are barred by the Eleventh Amendment. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

16